IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>KURT KRIEGER,<br><br>Debtor,<br><br>ROBERT G BELLER, ELLEN BELLER, and THE SETH BELLER TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>KURT KRIEGER,<br><br>Defendant. | CASE NO. 1:21-bk-01043-HWV<br><br>CHAPTER 13<br><br>ADVERSARY NO. 1:22-ap-00019-HWV<br><br>Nature of Proceeding: 62 Dischargeability – 523(a)(2), false pretenses, false representation, actual fraud; 67 Dischargeability – 523(a)(4), fraud as fiduciary, embezzlement, larceny |

**MEMORANDUM OPINION**

This adversary proceeding arises from a commercial lease and related construction financing involving property owned by Robert G. Beller and Ellen Beller (collectively, the "Bellers"). The Bellers and The Seth Beller Trust (collectively, the "Plaintiffs") allege that Kurt Krieger (the "Debtor" or "Kurt") caused them to receive a personal guaranty purporting to bear the signatures of his brother, Krisman Krieger, and sister-in-law, Amy Krieger, even though those signatures were not authentic or authorized. Plaintiffs contend that the Debtor knew, or was grossly reckless as to whether the guaranties were valid, and nevertheless caused them to be supplied in connection with the transaction. Based on those allegations, Plaintiffs seek a determination that the resulting debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A). (Doc. 44.)

For the reasons set forth below, the Court concludes that Plaintiffs have established the first four elements of their claim under § 523(a)(2)(A). Because the parties agreed to bifurcate damages, however, the Court reserves determination of the fifth element, together with the amount of any resulting nondischargeable debt, for the damages phase.

## I. Jurisdiction

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and the Court has authority to enter a final judgment.

## II. Factual Background and Procedural Posture

Kurt Krieger and his brother, Krisman Krieger ("Kris"), jointly operated a group of fitness businesses under the KK Fit name. Kurt testified that he and Kris were "equal partners" in the businesses and that he served as CEO, CFO, and COO. (Doc. 96, Trial Tr. 81:15–19.) Kurt also managed the KK Fit office in York, Pennsylvania, where Elizabeth Hagens ("Hagens") worked as an employee and notary public. (*Id.* at 81:23–82:1.) Hagens performed administrative functions for the KK Fit businesses under Kurt's management, including notarizing and transmitting transaction documents. (Ex. P-32 at 25:14–26:12, 39:5–19, 51:2–53:19.)

After KK Fit Allentown, Inc. ("KK Fit Allentown") lost its lease at its existing Allentown location, Kurt and Kris began looking for a replacement location and identified property at 2919 Lehigh Street in Allentown, Pennsylvania (the "Property"), owned by the Bellers. (Trial Tr. 83:4–13.) In 2011, KK Fit Allentown negotiated with the Bellers to lease the Property and obtain financing to convert it for use as a gym. The resulting transaction provided KK Fit Allentown with a lease of the Property (the "Lease") and up to $420,000 in construction financing for improvements to the Property.[1] (Exs. P-1, P-2.)

In connection with the financing, the Bellers required personal guaranties from Kurt, Kris, and Kris's wife, Amy Krieger ("Amy"). (*See* Exs. P-4, P-6; *see also* Trial Tr. 46:7–9.) The requirement generated disagreement among the Kriegers. Kurt was recently divorced and

---

[1] The note and associated guaranty were later transferred to The Seth Beller Trust, which then became the lender. (Trial Tr. 46:12–15.)

therefore could not provide a corresponding spousal guaranty. (Trial Tr. 110:24–111:4.) Kris objected to exposing Amy to a personal guaranty when Kurt would not be providing one from a spouse, an objection Kurt acknowledged at trial. (*Id.* at 110:24–111:10, 116:21–117:9.) Amy, for her part, had little involvement in the day-to-day operation of the KK Fit businesses. (*Id.* at 140:14–15, 141:14–20, 153:25–154:6.) Whether Amy nevertheless authorized execution of the guaranty on her behalf later became a principal factual dispute in this proceeding.

The guaranty returned to the Bellers (the "Guaranty") identified Kurt, Kris, and Amy as guarantors and bore signatures purporting to be theirs. (Ex. P-4.) It contained a separate notarial acknowledgment for each guarantor, executed by Hagens, stating that the named person had personally appeared before her and acknowledged voluntarily signing the document. (*Id.*) Kurt testified that Hagens notarized documents only when instructed by him, Kris, or both. (Trial Tr. 107:25–108:4.) When asked whether Hagens had been so instructed to notarize this Guaranty, Kurt answered, "Absolutely." (*Id.* at 107:21–108:7.) After the documents were completed, they were transmitted to the Bellers. Kurt testified that Hagens transmitted them under his supervision and management and that he and Kris wanted the completed documents transmitted. (*Id.* at 96:21–24, 97:14–98:5, 100:6–15.)

The circumstances surrounding the signatures and notarizations are central to the present dispute. Kurt acknowledged that Hagens sometimes notarized Kris's signature when Kris was not present and that the instruction to do so could come from either Kurt or Kris. (*Id.* at 94:5–95:11.) He further acknowledged that Kris had signed Amy's name on other occasions. (*Id.* at 95:20.) When asked whether he and Kris would "enable and expect" Hagens to notarize Amy's signature when he believed Kris had signed Amy's name, Kurt answered, "Yeah, correct." (*Id.* at 105:5–106:10; *see also* 117:5–9.) Amy denied signing this Guaranty or authorizing anyone else

to sign it for her, *id.* at 131:21–132:23, 139:23–140:7, and Kris testified that he did not go to the York office on November 14, 2011 to have the Guaranty notarized, *id.* at 153:9–18. Amy likewise testified that she did not believe she saw Hagens that day. (*Id.* at 132:25–133:8.) The parties sharply dispute what may be inferred from these circumstances concerning the Guaranty, including whether Amy authorized execution on her behalf, whether Kris and Amy personally appeared before Hagens, and what Kurt knew or believed when the completed Guaranty was transmitted. Those matters are addressed in detail below.

KK Fit Allentown later defaulted on its obligations arising from the transaction, and the Bellers commenced litigation in the Court of Common Pleas of Lehigh County against KK Fit Allentown and the Kriegers. During that litigation, Kris and Amy disputed their obligations under the Guaranty, and the state court ultimately entered judgment in their favor. (*See* Ex. P-44.)[2]

Kurt filed a voluntary Chapter 13 petition on May 7, 2021. Plaintiffs commenced this adversary proceeding on May 6, 2022 and later filed the operative Amended Complaint. (Doc. 44.) Plaintiffs now proceed solely under 11 U.S.C. § 523(a)(2)(A).[3]

The Court conducted trial on September 17, 2025. Robert Beller, Kurt, Amy, and Kris testified, and the evidentiary record also included Hagens's deposition testimony and

[2] The state court judgment is recounted only as part of the procedural history. The parties do not contend that the decision has preclusive effect, and this Court agrees that it does not. Plaintiffs expressly disclaimed reliance on *res judicata*. (Trial Tr. 197:4–5 ("I'm not suggesting that it's res judicata, Your Honor.").) At trial, the Court also noted that Kurt was no longer participating as a party in the state-court proceeding and had not necessarily been afforded a full and fair opportunity to litigate the forgery issue. (*Id.* at 196:16–197:3.) Consistent with that limitation, the state court decision was admitted "for purposes of its existence only," with the Court expressly stating that it was "not bound by the findings by the state court." (*Id.* at 197:19–24.)

[3] Plaintiffs have withdrawn Count II of the Amended Complaint, which sought nondischargeability under 11 U.S.C. § 523(a)(4). Although Count I did not specify which subsection of § 523(a)(2) Plaintiffs invoked, their post-trial brief clarified that they proceed solely under § 523(a)(2)(A). (*See* Doc. 102.) Plaintiffs confirmed that position at oral argument. (Doc. 110.)

documentary exhibits. By agreement, the Court reserved damages for a separate phase of the proceeding. (*See* Trial Tr. 51:19–22, 53:6–8, 166:12–21.) Following trial, the parties submitted post-trial briefs, Docs. 102, 106,[4] and the Court heard oral argument on February 24, 2026. The issues addressed in this Opinion are now ready for decision.

## III. Analysis

The issue before the Court is whether Kurt caused the Bellers to enter the Lease and financing transaction through material misrepresentations concerning the Guaranty, such that any resulting debt is nondischargeable under § 523(a)(2)(A).

Plaintiffs contend that the completed Guaranty falsely represented that Kris and Amy had undertaken the personal obligations stated in it and that each had personally appeared before a notary and acknowledged signing it. They contend those representations are attributable to Kurt, that he knew they were false or acted with gross recklessness as to their truth, that he intended to deceive the Bellers, and that the Bellers relied on them in proceeding with the Lease and financing.

Kurt disputes that Plaintiffs have established any material misrepresentation attributable to him. He contends that Plaintiffs failed to prove that Kris's and Amy's purported undertakings were unauthorized, that he caused any unauthorized signature to be affixed, or that he knew or was grossly reckless as to the falsity of any representation or intended to deceive the Bellers. He also disputes the "obtained by" and reliance requirements of § 523(a)(2)(A). The Court considers the parties' respective arguments below.

[4] The Court does not consider Plaintiffs' Supplemental Brief, Doc. 108, because it was not authorized by the Court's September 18, 2025 Order setting the post-trial briefing schedule, Doc. 88, and was filed approximately two hours before oral argument.

Exceptions to discharge under § 523(a) are "strictly construed against creditors and liberally construed in favor of debtors because of the overriding bankruptcy purpose of granting debtors a fresh start." *Jou v. Adalian* (*In re Adalian*), 474 B.R. 150, 160 (Bankr. M.D. Pa. 2012) (citation omitted); *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991). Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud, other than a statement [regarding] the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A).

To establish nondischargeability under § 523(a)(2)(A), a creditor must prove by a preponderance of the evidence that: "(1) the debtor obtained money, property[,] or services through a material misrepresentation; (2) the debtor, at the time, knew the representation was false or made with gross recklessness as to its truth; (3) the debtor intended to deceive the creditor; (4) the creditor justifiably relied on the debtor's false representation; and (5) the creditor sustained a loss and damages as a proximate result of the debtor's materially false representations." *United States SEC v. Bocchino* (*In re Bocchino*), 794 F.3d 376, 380–81 (3d Cir. 2015) (approving the formulation adopted in *Cohen v. De La Cruz* (*Cohen III*), 106 F.3d 52, 54–55 (3d Cir. 1997), and quoting *De La Cruz v. Cohen* (*Cohen II*), 191 B.R. 599, 604 (D.N.J. 1996)); *see also Field v. Mans*, 516 U.S. 59, 70–71 (1995) (holding that the fourth element requires justifiable reliance, not reasonable reliance). The creditor must prove each element by a preponderance of the evidence. *Grogan*, 498 U.S. at 289. A failure to establish any one element is fatal to the claim. *Johnnie's Rest. & Hotel Serv. v. Witmer* (*In re Witmer*), 541 B.R. 769, 777 (Bankr. M.D. Pa. 2015).

### A. Money, Property, or Services Obtained Through a Material Misrepresentation

The first element requires Plaintiffs to establish that qualifying money, property, services, or credit was obtained through a material misrepresentation. Two distinct questions arise under this element: first, whether § 523(a)(2)(A)'s "obtained by" requirement is satisfied even though Kurt did not personally receive the Lease or construction-financing proceeds; and second, whether the Guaranty contained or conveyed a material misrepresentation through which the Lease and financing were obtained. The Court begins with the "obtained by" requirement.

#### 1. The "Obtained By" Requirement

The relevant language of § 523(a)(2)(A) is "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). On its face, the statute does not require that the debtor directly and personally receive the money, property, services, or credit obtained through fraud. The authorities interpreting § 523(a)(2)(A) support that textual reading and establish two principles that guide the Court's analysis of this requirement.

First, "[o]nce it is established that specific money or property has been obtained by fraud, . . . 'any debt' arising therefrom is excepted from discharge." *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998). Section 523(a)(2)(A) excepts from discharge "debts in which the debtor used fraudulent means to obtain money, property, services, or credit." *Nunnery v. Rountree* (*In re Rountree*), 478 F.3d 215, 219 (4th Cir. 2007). Thus, § 523(a)(2)(A) requires that qualifying money, property, services, or credit be obtained through fraud, but once that occurs, the exception extends to *any* debt arising from that fraudulent acquisition.[5]

---

[5] The Supreme Court's textual analysis in *Bartenwerfer v. Buckley*, 598 U.S. 69, 75–76 (2023), reinforces this reading. In construing § 523(a)(2)(A), the Court explained that the provision focuses on an event rather than a particular actor. *Id*. at 75.

Second, and consistent with the first principle, "[t]he fact that a third party received the proceeds of a loan does not preclude a creditor's nondischargeability claim against a guarantor of the credit facility." *Sherwin Williams Co. v. Grasso* (*In re Grasso*), 497 B.R. 434, 443 (Bankr. E.D. Pa. 2013); *see also Brady v. McAllister* (*In re Brady*), 101 F.3d 1165, 1172 (6th Cir. 1996) (rejecting the proposition that nondischargeability requires proof that "the debtor directly and personally received every dollar lost by the creditor"). Thus, the value obtained through the fraud need not pass directly to the debtor.[6]

Applying these principles here is straightforward. It is undisputed that KK Fit Allentown obtained qualifying property and credit through the transaction in the form of the Lease and construction financing from the Bellers. The fact that KK Fit Allentown, rather than Kurt personally, received that property and credit does not, by itself, defeat § 523(a)(2)(A)'s "obtained by" requirement. Plaintiffs must separately establish that the Lease and financing were obtained through material misrepresentations attributable to Kurt, and the Court addresses that question below. But if Plaintiffs establish that nexus, Kurt's lack of personal receipt does not bar satisfaction of the "obtained by" requirement.

Kurt argues otherwise, relying on *Hydock v. Schermer* (*In re Schermer*), 388 B.R. 123, 127–28 (Bankr. E.D. Pa. 2008). That reliance is misplaced. The § 523(a)(2)(A) claim in *Schermer* failed because the complaint did not allege that money, property, services, or credit had been obtained through fraud. *Id.* at 127–28. Thus, although *Schermer* quoted an earlier decision stating that something of value must be "transferred to the debtor from the creditor," *id.* at 128 (quoting *Fledderman v. Glunk* (*In re Glunk*), 343 B.R. 754, 758 (Bankr. E.D. Pa. 2006)), that

[6] Courts have taken differing approaches to whether a debtor who does not personally receive the value obtained through fraud must nevertheless derive some direct or indirect benefit from it. *See Glencove Holdings, LLC v. Bloom* (*In re Bloom*), No. 22-1005, 2022 WL 2679049, at *5–6 (10th Cir. July 12, 2022). The Court need not resolve that question because, as discussed below, any such requirement is satisfied here.

proposition did not control its disposition. Moreover, a later decision from the same court held in the guarantor context that "[t]he fact that a third party received the proceeds of a loan does not preclude a creditor's nondischargeability claim against a guarantor of the credit facility." *In re Grasso*, 497 B.R. at 443. *Schermer* therefore does not establish the personal-receipt requirement Kurt advances.

Even assuming § 523(a)(2)(A) requires a debtor who does not personally receive the value obtained through fraud to derive some direct or indirect benefit from the transaction, that requirement is satisfied here. Under the receipt-of-benefits approach, an indirect benefit to the debtor may suffice by way of a debtor's ownership and management relationship to the entity or enterprise that received the value obtained through the fraud. *See, e.g.*, *Glencove Holdings, LLC v. Bloom* (*In re Bloom*), No. 22-1005, 2022 WL 2679049, at *6 (10th Cir. July 12, 2022) (declining to decide whether a direct or indirect benefit requirement applies, but concluding that even if it did, the requirement was satisfied because the debtor was the sole member of a business which had obtained money due to the debtor's fraud); *In re Grasso*, 497 B.R. at 443 (concluding that the debtor's relationship to the recipient enterprise was "sufficient to establish that benefits accrued to him as a result of the . . . investment").

That standard is satisfied here. The Court finds that Kurt held at least a fifty-percent ownership interest in KK Fit Allentown at the time of the transaction. (*See* Ex. D-1.) Kurt testified that he and Kris were "equal partners" in the KK Fit businesses and that he served as CEO, CFO, and COO. (Trial Tr. 81:15–19.) KK Fit Allentown obtained the Lease as tenant and up to $420,000 in construction financing as borrower. (Exs. P-1, P-2.) Kurt also acted on behalf of KK Fit Allentown in the transaction. The Lease identified him as its CEO, and he signed the loan agreement on behalf of the corporate borrower. (Trial Tr. 41:10–42:5; Exs. P-1, P-2.)

Because the value obtained through the transaction went directly to an entity in which Kurt held a substantial ownership interest and which he managed, the receipt-of-benefits requirement, if applicable, is satisfied.

Accordingly, Kurt's lack of personal receipt does not defeat the "obtained by" requirement. And even if § 523(a)(2)(A) additionally requires a direct or indirect benefit to Kurt, that requirement is satisfied.

**2. Material Misrepresentation**

The second issue here is whether Plaintiffs have established by a preponderance of the evidence that the completed Guaranty contained or conveyed one or more material misrepresentations attributable to Kurt. Plaintiffs contend that the Guaranty falsely represented that Kris and Amy had undertaken the personal guaranty obligations stated in it. They further contend that it falsely represented that each had personally appeared before the notary and acknowledged signing it. Kurt responds that Plaintiffs have not proven that either purported undertaking was unauthorized. He also contends that they have not shown that he personally wrote or caused any unauthorized signature to be affixed, or otherwise made or adopted a false representation concerning the Guaranty.

Section 523(a)(2)(A) encompasses both express and implied misrepresentations. "A 'false pretense' is an implied misrepresentation or conduct which creates and fosters a false impression, as distinguished from a 'false representation' which is an express misrepresentation." *Adalian*, 474 B.R. at 160 (quoting *Stevens v. Antonious* (*In re Antonious*), 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006) (internal quotation marks omitted)); *see also Wolstein v. Docteroff* (*In re Docteroff*), 133 F.3d 210, 216 (3d Cir. 1997) (explaining that fraud under § 523(a)(2)(A) "does not require an affirmative statement" and may be predicated on the failure to disclose a material fact).

As reflected in the governing § 523(a)(2)(A) standard, the misrepresentation must also be material. *See In re Bocchino*, 794 F.3d at 380–81. Because the fraud terms used in § 523(a)(2)(A) carry their common-law meaning, common-law principles inform the materiality inquiry. *See Field*, 516 U.S. at 68–70. Consistent with those common-law principles, the Third Circuit has explained in the closely related § 523(a)(2)(B) context that "[i]t is sufficient that the false statement is one that is capable of influencing, or had a natural tendency to influence, a creditor's decision." *Insurance Co. of North America v. Cohn* (*In re Cohn*), 54 F.3d 1108, 1115 (3d Cir. 1995).

Applying these standards, the Court considers in turn whether the notarial acknowledgments were false, whether Amy's purported guaranty obligation was unauthorized, whether those misrepresentations are attributable to Kurt, and whether they were material.

**a. False Notarial Acknowledgments**

The Guaranty is a single agreement purporting to bear the signatures of Kurt, Kris, and Amy. Each purported guarantor is the subject of a separate notarial acknowledgment. (Ex. P-4.) As to both Kris and Amy, Hagens certified that the named person "personally appeared before me this day" and acknowledged that he or she "voluntarily signed the foregoing document for the purpose stated therein and in the capacity indicated." (*Id.*)

The Court finds by a preponderance of the evidence that neither Kris nor Amy personally appeared before Hagens for those acknowledgments. Kris testified that he did not go to the York office on November 14, 2011 to have Hagens notarize the Guaranty. (Trial Tr. 153:9–18.) Amy likewise testified that she did not believe she saw Hagens that day. (*Id.* at 132:25–133:8.) Hagens could not recall the circumstances surrounding the subject notarizations or whether Kris and Amy signed the documents in her presence. (Ex. P-32 at 57:12–18, 67:24–68:8.) She also

acknowledged a practice of notarizing signatures when the purported signer was absent. (*See id.* at 57:12–18, 64:12–65:16, 67:24–68:8.)

Kurt's testimony also supports that finding and is consistent with Hagens's practice. Specifically, Kurt testified that he did not recall seeing Kris or Amy sign these documents. (Trial Tr. 89:2–3.) He further testified that Amy "hardly ever" came to the York office and that Kris "hardly ever" came there in November 2011. (*Id.* at 89:9–13.) Kurt also acknowledged that Hagens would notarize Kris's signature when Kris was not present. (*Id.* at 94:5–95:11.) He further testified that Hagens notarized documents only when instructed by him, Kris, or both. (*Id.* at 108:3–4.) When asked whether Hagens had been so instructed to notarize this Guaranty, Kurt answered, "Absolutely." (*Id.* at 107:21–108:7.)

Accordingly, the notarial acknowledgments falsely represented that Kris and Amy had personally appeared before Hagens.

**b. Amy's Purported Guaranty Obligation**

The Guaranty expressly identified Amy as one of the "Guarantors" and obligated the Guarantors to guarantee KK Fit Allentown's payment and performance. It also bore a signature purporting to be Amy's. (Ex. P-4.) Presented as a completed transaction document, the Guaranty therefore represented that Amy had undertaken the personal guaranty obligations stated in it.

The Court finds, by a preponderance of the evidence, that Amy did not undertake those obligations. Amy denied signing the Guaranty and denied authorizing anyone else to sign it on her behalf. (*See* Trial Tr. 131:21–132:23, 139:23–140:7). Handwriting expert J. Wright Leonard's state court testimony corroborated that the signature was not written by Amy. (Ex. P-68A at 35:6–36:9.) The surrounding circumstances also support Amy's denial of authorization. She played little role in KK Fit's day-to-day business affairs. (*See* Trial Tr. 140:14–15, 141:14–20,

153:25–154:6.) Kris also specifically objected to exposing Amy to the guaranty obligation, a circumstance Kurt himself acknowledged. (*See id.* at 110:24–111:10, 116:21–117:9.)

Although there was evidence that Kris had signed Amy's name on other occasions, the Court gives that evidence limited weight as proof that Amy authorized execution of this Guaranty. Kris testified that, to the extent he may have signed Amy's name on other occasions, it was not on matters "of relative importance," and he identified something such as a donation to a local baseball team as the type of matter on which he might have done so. (*Id.* at 155:2–10.) This Guaranty was materially different. It imposed an unconditional personal guaranty of KK Fit Allentown's obligations under a $420,000 note. (Ex. P-4.) That was plainly a matter of "relative importance."

The Court credits Amy's testimony on this point. Although her recollection of some of the surrounding circumstances was incomplete, her denial that she authorized anyone to sign the Guaranty on her behalf was unequivocal and consistent with the surrounding evidence described above. The Court need not determine who physically wrote Amy's name. Plaintiffs have proven that Amy did not write it and did not authorize another person to sign the Guaranty on her behalf. The completed Guaranty therefore falsely represented that Amy had undertaken those obligations.

The Court need not independently determine whether Kris authorized another person to sign the Guaranty on his behalf. The false notarial acknowledgments, together with the false representation that Amy had undertaken the guaranty obligations attributed to her, provide the misrepresentations relevant to the remaining inquiry. The Court therefore turns to whether those misrepresentations are attributable to Kurt and were material to the transaction.

### c. Attribution to Kurt

The next question is whether these misrepresentations are attributable to Kurt. They are. This was not a circumstance in which Kurt merely received a completed document previously notarized by an independent third party. Hagens worked under Kurt's management, and Kurt testified that she notarized documents only when instructed by him, Kris, or both. (Trial Tr. 107:25–108:4.) When asked whether Hagens had been so instructed to notarize this Guaranty, Kurt answered, "Absolutely." (*Id.* at 107:21–108:7.) After the documents were completed, they were transmitted to the Bellers. Kurt testified that Hagens transmitted them under his supervision and management and that doing so was what he and Kris wanted. (*Id.* at 96:21–24, 97:14–98:5, 100:6–15). He also agreed that he sent the documents to the Bellers after they had been signed. (*Id.* at 117:14–16.) The Court need not resolve who actually transmitted the documents because, under either account, Kurt caused the completed documents to be transmitted to the Bellers. His testimony further established that he understood the Bellers expected all three guarantors' signatures and notarizations. (*Id.* at 107:2–7.)

Kurt therefore did more than merely transmit representations made by others. By helping procure the notarization and causing the completed Guaranty to be transmitted, Kurt conveyed the representations at issue. Those representations were that Amy had undertaken the guaranty obligations attributed to her and that Kris and Amy had personally appeared before Hagens and acknowledged signing the Guaranty. Because Kurt conveyed those representations through his conduct rather than through an affirmative statement of his own, they are properly analyzed as false pretenses under § 523(a)(2)(A).

Plaintiffs were not required, for purposes of establishing this element, to prove that Kurt personally wrote the disputed signatures or directed another person to do so. Whether Kurt knew

the representations were false or acted with gross recklessness as to their truth, and whether he intended to deceive the Bellers, are separate questions addressed below.

#### d. Materiality

Both misrepresentations were material. The Guaranty itself recites that the "Lender [wa]s unwilling to lend funds to Borrower unless Guarantors unconditionally guarantee payment of the Note," confirming the importance of the personal guaranties to the loan transaction. (Ex. P-4.) Robert Beller likewise testified that if only two of the three required signatures and acknowledgments had been returned, he would have sent the documents back for completion and, if they remained incomplete, would not have proceeded with the transaction. (Trial Tr. 44:9–18.) He further testified that the Bellers "needed and insisted" from early in the transaction upon adequate security and guarantees for the loan. (*Id.* at 45:25–46:9.)

The false acknowledgments were independently material. When asked whether he would have proceeded if the documents had been returned without notarial seals for the three guarantors, Beller answered, "Absolutely not." (*Id.* at 44:19–22.) When the question was narrowed to whether he would have advanced the $420,000 without those seals, he again answered, "Absolutely not." (*Id.* at 45:3–5.) The representations that Amy had undertaken the guaranty obligations attributed to her and that Kris and Amy had personally appeared and acknowledged signing the Guaranty were therefore capable of influencing, and had a natural tendency to influence, the Bellers' decision to proceed with the transaction and fund the loan.

Accordingly, Plaintiffs have proven by a preponderance of the evidence that the completed Guaranty materially misrepresented that Amy had undertaken the guaranty obligations attributed to her and that Kris and Amy had personally appeared before Hagens and acknowledged signing it. For the reasons stated above, those misrepresentations are attributable

to Kurt for purposes of § 523(a)(2)(A). The Court need not independently determine whether Kris authorized another person to sign the Guaranty on his behalf. The Court next considers the remaining state-of-mind elements.

**B. Knowledge or Gross Recklessness**

The second element requires Plaintiffs to prove that Kurt, at the time of the misrepresentation, "knew the representation was false or made [it] with gross recklessness as to its truth." *In re Bocchino*, 794 F.3d at 380. Because § 523(a)(2)(A) does not specify the required level of intentionality, the Third Circuit looks to the common law for guidance. *Id.* at 381. As the Supreme Court explained in *Field*, the statute uses common-law terms that "imply elements that the common law has defined them to include." 516 U.S. at 69. Accordingly, *Bocchino* looked to the Restatement (Second) of Torts, which provides:

> A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.

*In re Bocchino*, 794 F.3d at 381 (quoting Restatement (Second) of Torts § 526).

*Bocchino* also drew support from *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013). There, in construing § 523(a)(4), the Supreme Court explained that reckless conduct may substitute for actual knowledge when the actor "consciously disregards" or is willfully blind to "a substantial and unjustifiable risk," and that disregard involves "a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *Bullock*, 569 U.S. at 274. The Third Circuit concluded that *Bullock*'s reasoning applies "with similar force to § 523(a)(2)(A)." *In re Bocchino*, 794 F.3d at 381–82. Thus, gross recklessness satisfies this element even in the absence of actual knowledge, but requires more than negligence or a showing that the debtor should have known the representation was false. *Id.* at 380–82.

Plaintiffs have satisfied the gross-recklessness alternative of this element. The most significant evidence comes from Kurt's own testimony concerning his knowledge of Hagens's notarization practices and his participation in that process. Kurt acknowledged that Hagens sometimes notarized Kris's signature when Kris had not appeared before her. (Trial Tr. 94:5–95:11.) He further acknowledged that Kris had signed Amy's name on other occasions. When asked whether he and Kris would "enable and expect" Hagens to notarize Amy's signature when he believed Kris had signed Amy's name, Kurt answered, "Yeah, correct." (*Id.* at 105:5–106:10.) This was not merely a failure to investigate. Kurt knew from experience that a notarial acknowledgment from Hagens did not necessarily mean that the named signer had personally appeared before her.

The circumstances surrounding this Guaranty further support a finding of gross recklessness. Kurt testified that Hagens notarized documents only when instructed by him, Kris, or both. When asked whether Hagens had been so instructed to notarize this Guaranty, Kurt answered, "Absolutely." (*Id.* at 107:21–108:7.) Kurt also understood that the Bellers expected all three signatures and notarizations. Yet, despite knowing that Hagens notarized signatures when the named signer was absent, he could identify no specific knowledge of how Kris's and Amy's signatures appeared on the Guaranty and could not recall what steps he took to ensure the document was properly signed and notarized. (*Id.* at 107:2–20.) The completed documents were nevertheless transmitted to the Bellers under Kurt's supervision and management. (*Id.* at 100:6–15.)

Kurt's reliance on Hagens's notarizations did not provide a factual basis for believing that Kris or Amy had personally appeared before her. Although Kurt testified that he assumed the signatures were genuine because Hagens had notarized them, *id.* at 100:16–101:13, he also knew

from experience that Hagens notarized signatures when the named signer was absent. (*See id.* at 93:24–95:11, 96:11–17.) Thus, the notarizations themselves gave Kurt no reliable basis for believing that personal appearance had occurred. And even if Kurt believed the signatures were otherwise authorized, that would not establish personal appearance. Authorization and personal appearance are distinct propositions.

On these facts, Kurt's state of mind falls within the circumstances described in Restatement (Second) of Torts § 526(b) and (c). At a minimum, Kurt did not possess the confidence in the accuracy of the acknowledgments that his conduct implied, and he knew that he lacked a reliable basis for representing that Kris and Amy had personally appeared before Hagens. His conduct also exceeded mere carelessness. Kurt helped procure the notarization of this Guaranty through a process he knew Hagens used even when the named signer was absent. Yet he lacked a factual basis for believing that Kris and Amy had personally appeared before her. By proceeding in those circumstances, Kurt consciously disregarded a substantial and unjustifiable risk that the acknowledgments were false. Considering the nature of his conduct, the purpose the completed Guaranty was intended to serve, and the circumstances known to him, his disregard of that risk constituted a gross deviation from the standard of conduct that a law-abiding person would observe in his situation. It therefore constituted gross recklessness under *Bocchino* and *Bullock*.

The evidence likewise establishes at least gross recklessness as to the representation that Amy had undertaken the guaranty obligations attributed to her. Kurt knew that Kris had specifically objected to exposing Amy to those obligations. (*See* Trial Tr. 110:24–111:10, 116:21–117:9.) He also knew that Kris had signed Amy's name on other occasions. (*Id.* at 117:8–9.) Yet Kurt did not confirm whether Amy herself had signed this Guaranty. (*Id.* at

117:11–13.) When asked about that issue, he explained that "Kris signed Amy's name numerous times, so I just got the signed documents." (*Id.* at 117:5–13.) And when addressing whether Amy had agreed to the Guaranty notwithstanding Kris's earlier objection, Kurt testified, "So I assume she agreed." (*Id.* at 128:5–13.)

Those circumstances provided no reliable basis for representing that Amy had undertaken the guaranty obligations attributed to her. At a minimum, Kurt lacked the confidence in the accuracy of that representation that his conduct implied, and he knew that he lacked a reliable basis for it. By proceeding nonetheless, he consciously disregarded a substantial and unjustifiable risk that the completed Guaranty falsely represented that Amy had undertaken those obligations. Considering the circumstances known to Kurt, his disregard of that risk constituted a gross deviation from the standard of conduct that a law-abiding person would observe in his situation. That disregard therefore constituted gross recklessness under *Bocchino* and *Bullock*.

Accordingly, Plaintiffs have proven by a preponderance of the evidence that Kurt acted with gross recklessness as to the truth of both misrepresentations established above. Because gross recklessness satisfies the second element, the Court need not determine whether Kurt actually knew that Kris and Amy had not personally appeared before Hagens or that Amy had not authorized execution of the Guaranty. The Court next turns to the separate question of whether, considering the circumstances underlying that finding together with the record as a whole, Kurt intended to deceive the Bellers.

### C. Intent to Deceive

Under the governing standard, Plaintiffs must establish deceptive intent as a separate element. *In re Bocchino*, 794 F.3d at 380–82. Because direct evidence of deceptive intent is rarely available, "intent to deceive can be inferred from the totality of the circumstances,

including the debtor's reckless disregard for the truth." *In re Cohn*, 54 F.3d at 1118–19.[7] Thus, "a creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of, the accuracy of the information . . . when the totality of the circumstances supports such an inference." *Id.* at 1119; *see also In re Bocchino*, 794 F.3d at 382.

Applying that standard, the totality of the circumstances supports the inference that Kurt intended to deceive the Bellers. Here, that inference rests not only on the gross recklessness found above, but also on Kurt's role in the transaction, the purpose the Guaranty was intended to serve, and the Court's assessment of his testimony concerning how the document came to be completed and transmitted.

Kurt understood that the Bellers required a completed Guaranty from all three Kriegers before proceeding with the Lease and financing. He also played a central role in the transaction and in the office that processed, notarized, and transmitted the Guaranty. He managed Hagens, knew of the office's nonstandard signing and notarization practices, and was unequivocal that Hagens had been instructed by him, Kris, or both to notarize this particular Guaranty. Yet, despite that degree of knowledge and involvement, Kurt professed little recollection of how Kris's and Amy's signatures came to appear on the document.

The Court does not find Kurt's professed lack of knowledge and recollection fully credible. In light of his management of the office, his executive role in the KK Fit businesses, his involvement in this transaction, his understanding of the Bellers' requirements, and his participation in the processing, notarization, and transmission of this Guaranty, the Court finds

---

[7] *Cohn* arose under § 523(a)(2)(B). In *Bocchino*, however, the Third Circuit expressly relied on *Cohn*'s reasoning in construing § 523(a)(2)(A), observing that *Cohn* permitted intent to deceive to be established through reckless indifference or reckless disregard when supported by the totality of the circumstances. 794 F.3d at 382. The court further explained that it had been presented with no strong reason to read § 523(a)(2)(A) differently from related provisions of the Bankruptcy Code. *Id.*

that Kurt knew more about the circumstances surrounding the disputed signatures than his testimony disclosed. That finding does not establish who physically wrote either signature, nor does the Court infer the opposite of Kurt's testimony merely because portions of his account were unpersuasive. Rather, his lack of candor reinforces the inference of deceptive intent already supported by the objective evidence.

That inference is especially strong because Kurt's conduct aimed to secure a completed Guaranty that would permit the transaction to proceed. He knew the Bellers expected the document to show that Amy had undertaken the guaranty obligations attributed to her and that Kris and Amy had personally appeared before the notary. Yet he helped procure the completed instrument and caused it to be transmitted while consciously disregarding a substantial and unjustifiable risk that those representations were false. His explanation that, with respect to Amy, he simply "assume[d] she agreed" does not support an innocent inference that he merely passed along a document he reasonably believed to be accurate. Considered with the surrounding circumstances, it instead supports the inference that Kurt intended to deceive the Bellers through the representations conveyed by the completed Guaranty and thereby induce them to proceed with the Lease and financing.

The Court need not determine whether Kurt and Kris expressly agreed that the disputed signatures would be affixed, whether Amy knew at the time that her name would be used, or precisely how either signature came to appear on the Guaranty. The relevant inquiry is whether, considering the circumstances as a whole, Kurt intended to deceive the Bellers into believing that Amy had undertaken the guaranty obligations attributed to her and that Kris and Amy had personally appeared before Hagens and acknowledged signing the Guaranty, so that the Bellers

would proceed with the Lease and financing. The Court finds by a preponderance of the evidence that he did.

Accordingly, Plaintiffs have established the third element.

**D. Justifiable Reliance**

The fourth element requires Plaintiffs to establish that they actually and justifiably relied on the misrepresentations. *Field*, 516 U.S. at 70, 74–75. Justifiability depends upon "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case," rather than an objective reasonable-person standard. *Id.* at 71 (quoting Restatement (Second) of Torts § 545A cmt. b). Under this standard, § 523(a)(2)(A) "requires justifiable, but not reasonable, reliance." *Id.* at 74–75. Accordingly, a creditor may justifiably rely on a representation even though an investigation would have revealed its falsity, *id.* at 70, but cannot recover if he "blindly relies upon a misrepresentation the falsity of which would be patent to him" upon a cursory examination. *Id.* at 71 (quoting Restatement (Second) of Torts § 541 cmt. a).

Robert Beller's testimony establishes actual reliance. As discussed above, he testified that if the Guaranty had been returned with only two of the three required Krieger signatures and acknowledgments, he would have returned it for completion and, if it remained incomplete, would not have proceeded with the transaction. (Trial Tr. 44:9–18.) He likewise testified that he would "Absolutely not" have proceeded without the required notarial seals and would not have advanced the $420,000 without them. (*Id.* at 44:19–45:5.) The completed Guaranty was returned bearing Amy's purported signature and separate acknowledgments representing that Kris and Amy had personally appeared before Hagens. The Bellers thereafter proceeded with the Lease and financing. That evidence establishes that the Bellers in fact relied on the representations that

Amy had undertaken the guaranty obligations attributed to her and that Kris and Amy had personally appeared before Hagens.

That reliance was also justifiable. The Guaranty presented to the Bellers appeared on its face to be a completed transaction document bearing the required signatures and notarial acknowledgments. Nothing on the face of the document disclosed that Kris and Amy had not personally appeared before Hagens or that Amy had not authorized another person to sign the Guaranty on her behalf. Nor is there evidence that the Bellers knew of the nonstandard signing and notarization practices described at trial. The circumstances that made Kurt grossly reckless as to the truth of the representations were not apparent to the Bellers from examination of the completed Guaranty.

*Field* does not require the Bellers to investigate the circumstances of execution independently merely because such an investigation might have uncovered the falsity. The relevant limitation is whether the falsity was patent upon cursory examination. On this record, it was not. The Bellers were therefore entitled to rely on the completed Guaranty and its facially regular acknowledgments without undertaking an independent inquiry into whether Amy had authorized another person to sign the Guaranty on her behalf or whether Kris and Amy had actually appeared before Hagens.

Accordingly, Plaintiffs have proven by a preponderance of the evidence that they actually and justifiably relied on the misrepresentations established above.

**E. Proximate Causation and Loss**

The fifth element requires Plaintiffs to prove that they "sustained a loss and damages as a proximate result of the debtor's materially false representations." *In re Bocchino*, 794 F.3d at 380–81 (internal quotation marks omitted). "Proximate cause is a term of art, demanding

sufficient connection between the injury and the conduct alleged[,]" and "includes both cause-in-fact and legal causation." *Id.* at 382–83. Cause-in-fact "depends on whether an act or omission played a material part in bringing about an event[,]" and an act or omission is not a cause-in-fact "if the particular event would have occurred without it." *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 73 (3d Cir. 1996). "Legal cause is established where the loss was reasonably expected to result from reliance upon the misrepresentation." *In re Bocchino*, 794 F.3d at 383.

If Plaintiffs ultimately establish the fifth element, the resulting exception from discharge is not limited to the value initially obtained through the fraud. Rather, "[o]nce it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge." *Cohen*, 523 U.S. at 218.

Because the Court bifurcated the damages phase from this phase of the proceeding, it does not presently determine whether Plaintiffs have established the fifth element. (*See* Trial Tr. 51:19–22, 53:6–9.) While defense counsel acknowledged that "there was a monetary default," *id.* at 54:19–22, that concession does not establish that Plaintiffs sustained a loss proximately caused by the fraud, nor does it determine the nature or amount of any such loss. Because the parties did not present the damages case in this phase pursuant to the agreed bifurcation, the record was not developed to permit those determinations. Accordingly, the Court reserves determination of the fifth element, together with the amount of any resulting nondischargeable debt, for the damages phase.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs have established by a preponderance of the evidence the first four elements of their claim under § 523(a)(2)(A). The Lease and construction financing satisfy the statute's "obtained by" requirement; the completed Guaranty contained

material misrepresentations attributable to Kurt; Kurt acted with gross recklessness as to the truth of those misrepresentations and with intent to deceive the Bellers; and the Bellers actually and justifiably relied on them in proceeding with the transaction.

The Court does not presently determine whether Plaintiffs sustained a loss proximately caused by Kurt's fraud. Because the parties did not litigate damages at this phase of the proceeding, the Court has reserved determination of the fifth element, together with the amount of any resulting nondischargeable debt, for the damages phase. Accordingly, final determination of Plaintiffs' claim under § 523(a)(2)(A) will await that proceeding.

An appropriate Order will be entered.

By the Court,

Henry W. Van Eck

Henry W. Van Eck, Chief Bankruptcy Judge
Dated: September 28, 2026